Law Offices of Peter H. Priest, PLLC v. Coch, 2014 NCBC 54.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF DURHAM | 12 CVS 3532 |

LAW OFFICES OF PETER H. )
PRIEST, PLLC, )
                                   )
         Plaintiff, )
                                   )
    v. )                   **ORDER AND OPINION**
                                   )
GABRIEL COCH and )
INFORMATION PATTERNS, LLC, )
                                   )
         Defendants. )
                                   )

{1} THIS MATTER is before the Court on Defendants' Motion for Summary Judgment ("Defendants' Motion") and Plaintiffs' Motion for Summary Judgment ("Plaintiff's Motion"), both made pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. For the reasons expressed below, Defendants' Motion is GRANTED, and Plaintiff's Motion is DENIED.

> *J.W. Bryant Law Firm, PLLC by John Walter Bryant and Amber J. Ivie for Plaintiff Law Offices of Peter H. Priest, PLLC.*
>
> *Glenn, Mills, Fisher & Mahoney, P.A. by Carlos E. Mahoney for Defendants Gabriel Coch and Information Patterns, LLC.*

Gale, Chief Judge.

## I.    INTRODUCTION

{2} Plaintiff Law Offices of Peter H. Priest, PLLC ("Law Offices"), of which attorney Peter H. Priest ("Priest") is the principal, seeks damages related to an

alleged breach of a contract ("the Agreement") entered into with Defendants Gabriel Coch ("Coch") and Information Patterns, LLC ("IP").[1]

{3}     Plaintiff alleges that the parties are bound to the Agreement, which entitled Plaintiff to a percentage of the sale of a patent for a technological device developed by Defendants.  Defendants contend that the Agreement cannot be enforced because it was not entered into in compliance with the procedural requirements for a business transaction between an attorney and client. Defendants further argue that, in any event, the contract allows for payment to Plaintiff of a share of licensing proceeds for the patent, but not for sales proceeds.

## II.     PROCEDURAL BACKGROUND

{4}     This action was filed in Durham County on June 19, 2012.  The matter was designated a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated July 24, 2012, and subsequently assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Special Superior Court Judge for Complex Business Cases.

{5}     Defendants filed a Motion to Dismiss on August 24, 2012, which was granted in part and denied in part on January 25, 2013, by the Order that dismissed Priest in his individual capacity as well as Plaintiff's claims for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices. Plaintiff's claims for breach of contract and fraud remain for disposition and are the subject of Plaintiff's and Defendants' motions.

{6}     Defendants filed a Motion for Summary Judgment on Plaintiff's breach of contract and fraud claims on January 21, 2014.  Plaintiff sought summary

---

[1] Peter H. Priest was joined as a Plaintiff in the Complaint, but was dismissed by the Court's January 25, 2013, Order.  Law Offices acted through Priest. Law Offices claims that Coch was a manager of a partnership that entered the Agreement with Law Offices that is at issue in the litigation, and that all actions taken by Coch are binding on him individually and on the partnership of which he was a member.   Accordingly, unless necessary to state otherwise in a particular context, Law Offices is referred to as "Plaintiff," acting through Priest, and "Defendants" refers to both Defendants collectively.

judgment in its own favor in Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment and in Support of Summary Judgment for Plaintiff ("Response"), filed on March 25, 2014. Both motions have been fully briefed, the Court has heard oral argument, and the motions are ripe for disposition.

### III. FACTUAL BACKGROUND

{7} The Court does not make findings of fact when ruling on a motion for summary judgment. *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975). However, it is appropriate for the Court to outline the undisputed facts or lack of facts in order to provide context for the Court's ruling. The Court believes the following facts to be uncontested.

#### A. The Parties

{8} Plaintiff Law Offices, formerly known as Priest & Goldstein, PLLC, is a North Carolina professional limited liability company, with its principal place of business in Chapel Hill, Orange County, North Carolina.

{9} Priest is a citizen and resident of Durham County, North Carolina, and is the sole owner of the Plaintiff.

{10} Defendant Coch is a citizen and resident of Chapel Hill, Orange County, North Carolina, and is a member-manager of Defendant Information Patterns, LLC ("IP").

{11} Defendant IP is a North Carolina limited liability company with its principal place of business in Chapel Hill, Orange County, North Carolina. IP is a small information technology company, formed in 2003. Graham Knight ("Knight") and Mark Smith ("Smith") are both citizens and residents of the United Kingdom, and, at the time relevant to this action, were both members of IP.

#### B. The Patent

{12} Coch, Knight, and Smith had developed a computer program for geo-collaboration titled "Methods and Apparatus for Geo-Collaboration" ("the

Program"). In either 2004 or 2005, Coch began discussions with Mr. Joe Agusta, an associate attorney working for Plaintiff and Coch's neighbor, regarding Agusta's assistance filing a patent for the Program.

{13} Under an early agreement between Plaintiff and Coch, Knight, and Smith, the fees due to Plaintiff for representation regarding filing a patent for the Program on behalf of Defendants would be limited to a maximum of $10,000. That amount was exhausted during the early stages of patent filing, and Defendants paid that amount in 2006.

{14} In December 2005, at around the same time as the first patent application was filed, Coch, Knight, and Smith transferred their interests in the Program to IP.

{15} The first filing with the U.S. Patent and Trademark Office for the Program was made in December of 2005 and remained pending until 2009. Agusta resigned from Plaintiff's employ in 2006.

{16} In late 2009, Plaintiff received a "Non-Final Rejection" of the patent application it had made on behalf of IP. Dr. Jerry Pechanek, an engineer employee of Plaintiff, began to draft a response to the Non-Final Rejection prior to contacting Coch, Knight, and Smith to discuss their options regarding pursuing patent approval. Plaintiff learned that Coch, Knight and Smith may have been financially unable to proceed with the patent registration. Plaintiff then offered to file the response to the Non-Final Rejection at Plaintiff's cost.

{17} On or about February 18, 2010, Plaintiff received a "Notice of Allowance," which indicated that a patent would be issued upon the filing of certain paperwork and payment of required fees. Plaintiff emailed Coch regarding this development. Coch, Smith, and Knight agreed to split the fees evenly.

{18} Around the same time that Coch, Smith, and Knight were discussing a fee-splitting arrangement, Plaintiff and Coch began discussing methods with which to monetize the patent, because Coch, Knight, and Smith were financially unable to continue forward with efforts to solicit a license. Plaintiff offered to form a

partnership with Defendants, in which Plaintiff would attempt to market the patent on Defendants' behalf.

## C.   The Alleged Agreement

{19}   Plaintiff alleges that Coch, on behalf of his fellow IP members, decided to enter into the Agreement with Plaintiff to handle the patent-related business, and notified Knight and Smith to this effect on March 23, 2010.  Prior to the Agreement's drafting, in emails to Knight and Smith, Coch referred to Priest as a partner and indicated that he intended for Priest to have an equity portion of the patent.[2]  Priest began drafting the Agreement and was largely responsible for the content of the contract, although Coch had some input.

{20}   Plaintiff claims that Priest orally notified Defendants that Defendants should have an attorney review the Agreement prior to their signature.  Plaintiff has produced no evidence that this advice was given in writing.  The parties agree that Knight was not advised, in writing or otherwise, of the desirability of seeking outside counsel, nor did he give written informed consent to Plaintiff's role in the transaction.

{21}   The Agreement provides that out-of-pocket, actual costs of patent filing, prosecution, and maintenance of the patent will be split equally among the four participants, as would be certain proceeds.  Although the parties agree that Plaintiff was entitled to a percentage of licensing proceeds, they do not agree that Plaintiff is entitled to a twenty-five percent interest in proceeds from the sale of the patent.

{22}   The Agreement was never fully executed in writing by Coch, Smith, or Knight.

{23}   After the Agreement was drafted, Plaintiff paid the full amount of the costs related to the continuing registration of the patent, subsequently billing Coch,

---

[2] Any interest the Priest received would have been through Law Offices, so that the Court does not seek to distinguish between them.

Smith, and Knight for their cumulative seventy-five percent share of the expenses due. Coch, Smith, and Knight paid the invoices.

{24} After the Agreement was drafted, Plaintiff began to send letters to business firms that it and Defendants thought may be interested in licensing the patent. No licenses were ever successfully negotiated, and no proceeds were received from licensing.

### D. The Sale of the Patent

{25} In September 2011, Coch began to explore the possibility of selling the patent. To do so, he began conversations with William J. Plut ("Plut"), a patent broker experienced in the sale of patents who worked for Patent Pending International ("PPI").

{26} After his initial conversations with Plut, Coch contacted Smith and Knight by e-mail to provide an update on his efforts to sell the patent. Coch, Smith, and Knight agreed that Coch should have an additional ten percent of any potential sale as a finder's fee. Coch then wrote Smith and Knight an e-mail indicating that the split after costs would be four ways, because Priest, as the "attorney who has filed for continuations and has kept this alive from a patent / legal perspective has 1/4 of it, as we agreed some time ago." (Pl.'s Br. in Opp'n to Defs.' Mot. Summ. J. ("Opp'n Br.") Ex. 20.) Coch also indicated that he wanted Priest's approval prior to signing a contract with Plut and PPI.

{27} Plaintiff was hesitant to enter into the contract with Plut and PPI to broker the sale of the patent. Coch arranged an in-person meeting between Priest and Plut, after which Priest approved having Plut broker the patent.

{28} After the meeting, Priest acknowledged that he could not find a copy of the Agreement signed by Defendants, and wanted to make revisions to the Agreement so that it would include the ability to work with Plut and his firm.

{29} Plut was retained to sell the patent in October 2011. Plut and PPI later brokered the sale of the patent for $1,000,000.00. The Patent Purchase

Agreement was signed by the buyer and IP on March 16, 2012. On March 19, 2012, the buyer wired the payment to IP's bank account.

{30} After the close of the sale, Plaintiff claimed that it was entitled to twenty-five percent of the revenue, reduced by Plut's brokerage fee and the finders' fee to Coch. Coch has refused that claim. Plaintiff filed this action on June 19, 2012. Funds representing Plaintiff's share have been held in escrow.

## IV. STANDARD OF REVIEW

{31} Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). "A defendant may show he is entitled to summary judgment 'by (1) proving that an essential element of the plaintiff's claim is nonexistent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense which would bar the claim.'" *Young v. Gum*, 185 N.C. App. 642, 645, 649 S.E. 2d 469, 472 (2007) (quoting *James v. Clark*, 118 N.C. App. 178, 181, 454 S.E.2d 826, 828 (1995)). In weighing whether to grant summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and draws all reasonable inferences in favor of the nonmovant. *Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 314, 498 S.E.2d 841, 848 (1998).

## V. ANALYSIS

### A. Nature of the Claims

{32} Plaintiff's breach of contract claim asserts that the Agreement is valid and should be enforced, entitling Plaintiff to twenty-five percent of the net proceeds realized from the sale of the patent. Specifically, Plaintiff claims Defendants breached the Agreement by failing to pay Plaintiff $200,000, together with incidental and consequential damages.

{33}    Plaintiff's fraud claim as stated in the Complaint alleges that, on or about January 2010, Defendants intentionally failed to deliver an executed copy of the Agreement in order to unfairly exercise control over revenues while denying that the Agreement had been entered.  Plaintiff further alleges that Defendants purposefully induced Plaintiff to provide legal services for Defendants with no intention to provide to Plaintiff the benefit of the Agreement, which induced Plaintiff to provide those services.

### B.    Whether There is a Valid, Enforceable Contract

{34}    Plaintiff correctly states that "[a]t the heart of this matter is the determination of whether a valid, enforceable contract exists."  (Opp'n Br. 12.)  Each of Plaintiff's claims require that the Agreement was validly entered and is enforceable.  If the Agreement is not valid and enforceable, Defendants are entitled to summary judgment on both claims.

{35}    Defendants claim that the Agreement cannot support any claim because of Plaintiff's failure to adhere to the North Carolina Rules of Professional Conduct (the "Rules") governing conflict-of-interest transactions between an attorney and his or her clients.

#### 1.    Using a Violation of the Rules as a Defense

{36}    North Carolina courts share regulation of attorneys with the North Carolina State Bar. *Swenson v. Thibaut*, 39 N.C. App. 77, 109, 250 S.E.2d 279, 299 (1978).  The North Carolina State Bar is statutorily empowered to discipline attorneys and regulate the practice of law.  N.C. Gen. Stat. § 84-28 (2013); *see also Thibaut*, 29 N.C. App. at 109, 250 S.E.2d at 299.  The enabling statute reserves significant regulatory power for the courts, stating that "[n]othing contained in this Article shall be construed as disabling or abridging the inherent powers of the Court to deal with its attorneys."  N.C. Gen. Stat § 84-36.  "This power of the court is an inherent one because it is an essential one for the court to possess in order for it to protect itself from fraud and impropriety and to serve the ends of the

administration of justice which are, fundamentally, the *raison d'etre* for the existence and operation of the courts." *Thibaut*, 39 N.C. App. at 109, 250 S.E.2d at 299.

{37}   Plaintiff argues that the Rules are not intended to be used as a procedural weapon to void an enforceable contract, relying on *Webster v. Powell*, 98 N.C. App. 432, 391 S.E.2d 204 (1990), which held that "a breach of the Code of Professional Responsibility is not 'in and of itself . . . a basis for civil liability.'" *Id.* at 439, 291 S.E.2d at 208 (quoting *McGee v. Eubanks*, 77 N.C. App. 369, 374, 335 S.E.2d 178, 181 (1985)); *see also* N.C. Rules of Prof'l Conduct R. 0.2[7]. That tenet has been affirmed several times. *See Baars v. Campbell Univ., Inc.*, 148 N.C. App. 408, 421, 558 S.E.2d 871, 879 (2002) (affirming that an attorney's violation of the Rules does not create a cognizable cause of action, sufficient to void a bequest to an attorney drafted by that attorney); *Webster*, 98 N.C. App. at 439, 291 S.E.2d at 208 (holding that evidence of a violation of disciplinary rules is not necessarily relevant to plaintiff's claim of attorney malpractice); *McGee*, 77 N.C. App. at 374, 335 S.E.2d at 181–82 (holding that a lawyer's improper trust account maintenance contrary to the Rules did not create civil liability).

{38}   But, here, while Plaintiff is correct that the Rules do not give rise to an affirmative claim of civil liability, Defendants have not asserted Plaintiff's liability. They contest their own liability to Plaintiff. The issue is whether the client can use the Rules defensively even though the client may not seek to impose civil liability based on a violation of the Rules.

{39}   Plaintiff also cites Rule 0.2 in support of its argument that the Rules cannot be used defensively. Comment [7] of Rule 0.2 defines the limitations of permissible use of the Rules:

> Violation of a Rule should not give rise itself to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. . . . The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural

weapons. . . . Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a Rule.

N.C. Rules of Prof'l Conduct R. 0.2[7]. Plaintiff argues that Defendants are doing exactly what this Comment forbids: using a violation of the Rules as a procedural weapon.

{40} However, Plaintiff's argument is foreclosed by precedent, by which this Court is bound. The Court of Appeals of North Carolina has previously addressed a similar argument in *Cunningham v. Selman*, 201 N.C. App. 270, 287–88, 689 S.E.2d 517, 528–29 (2009). In *Cunningham*, the plaintiff-attorney brought an action for fees related to his prior representation of the defendant. *Id.* at 271–77, 689 S.E.2d at 519–22. The defendant argued that the claim should be dismissed because of the plaintiff's failure to adhere to the North Carolina State Bar's fee dispute resolution rules and Rules of Professional Conduct. *Id.* at 275, 689 S.E.2d at 521–22. On appeal, the plaintiff argued that the defendant had inappropriately used the Rules as a procedural weapon, citing *Baars v. Campbell University* and Comment [7] of Rule 0.2. *Id.* at 287, 689 S.E.2d at 528–29.

{41} In finding that defensive use of the Rules was not prohibited by the principles in *Baars* or Comment [7], the *Cunningham* court stated that "Comment [7] and the principle enunciated in *Baars* are directed primarily toward cases in which a former client claims that an attorney is civilly liable, based, in whole or in part, on alleged violations of the Rules of Professional Conduct." *Id.* at 287–88, 689 S.E.2d at 529. The court further explained:

> In this case . . . the principle upon which Plaintiff relies is totally inapplicable because Defendant does not seek to hold Plaintiff liable for an alleged violation of [the Rules]; instead, Defendant found herself on the receiving end of civil litigation after having invoked the State Bar's fee dispute resolution process and attempted to use Plaintiff's noncompliance with the State Bar's Rules as a jurisdictional defense to Plaintiff's claim.

*Id.* at 288, 689 S.E.2d at 529. In short, the *Cunningham* court found that neither Comment [7] nor the principles enunciated in *Baars* prohibited the defensive use of

the Rules, and it was proper to dismiss the attorney's claim because of the failure to abide by the Rules.

{42}    Plaintiff's attack on the defense in this case is identical to the argument rejected in *Cunningham*. The Court does not believe that *Cunningham*'s central holding is made inapplicable simply because the *Cunningham* appeal followed a fee-dispute administrative proceeding.  Rather, the Court finds that this case is controlled by *Cunningham*'s holding that the affirmative use of the Rules as a defense to an attorney's claim is proper where the procedural requisites of Rule 1.8 are not satisfied.  Rule 1.8 reflects that attorneys have a special obligation when dealing with their clients and are thus fairly held to abide by the Rules as a condition of their own recovery when the recovery is based on contracts with their clients.

{43}    In sum, the Court finds that Rule 1.8 may be used by the Defendant to defend against Plaintiff's claim.  The question then is whether Plaintiff has complied with the Rule sufficiently to bar the defense.  As noted below, the Court further believes these requirements must be strictly applied and that any argument of substantial compliance because of oral communications must fail.

## 2.    Application of Rule 1.8

{44}    Plaintiff first counters the defense by arguing that the Agreement does not fall within the scope of Rule 1.8(a), which only applies to "a business transaction . . . directly adverse to a client," and here Plaintiff was not directly adverse to Defendants when entering the Agreement. (Opp'n Br. 19.) (quoting N.C. Rules of Prof'l Conduct R. 1.8(a).)  Plaintiff's argument misinterprets the Rule.  Rule 1.8(a) provides that "[a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest directly adverse to a client."  N.C. Rules of Prof'l Conduct R. 1.8(a).  Plaintiff seeks to graft the condition of "directly adverse" onto any business transaction between attorney and client, essentially ignoring the disjunctive "or" between business transactions and adverse interests.  The Court reads Rule 1.8 to apply to any

business transaction between attorney and client. A business transaction does not fall outside Rule 1.8 just because the attorney is not directly adverse to the client.[3] Stated differently, an attorney cannot defend against the failure to comply with the requirements of Rule 1.8 upon proof that the interests are not adverse.

{45}    Plaintiff does not attempt to nor could it fairly argue that the Agreement was not a business transaction between attorney and client.  Priest himself denotes the business nature of the transaction when he characterizes the Agreement as an "agreement to allow my firm to share in the success of the value of the family of patents." (Priest Aff. ¶ 85, Mar. 25, 2014.)  The Court finds that the Agreement represented a business transaction subject to the requirements of Rule 1.8.

### 3.    Plaintiff's Violation of Rule 1.8

{46}    Pursuant to Rule 1.8, the Agreement cannot be enforced unless the following requirements are met:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

N.C. Rules of Prof'l Conduct R. 1.8(a)(1)–(3).

{47}    Here, the Court can assume, without needing to decide, that Plaintiff could prove that the Agreement's terms are fair and reasonable.  Rather, the Court focuses its inquiry on subsections (2) and (3).

---

[3] The Court need not undertake an analysis of whether the interest between Plaintiff and Defendants was actually adverse had Defendants elected to affirm the Agreement.  An earlier version of Rule 1.8 may have allowed for such a case-by-case inquiry, but the present rule is more absolute in its requirements.

{48}    Rule 1.8(a)(2) requires that the client be advised in writing as to the desirability of obtaining independent counsel, and that the client must be given the opportunity to do so.  Plaintiff produces evidence that it may have substantially complied with Rule 1.8, highlighting that Priest orally advised Coch to see another attorney and that communications between Coch and his fellow IP members evidence their understanding of the nature of the Agreement and their intent to be bound.  However, the Court does not believe Rule 1.8 allows for substantial compliance, but rather that an attorney is held to strict compliance with its requirements.  Because Plaintiff clearly did not advise Defendants in writing to seek outside counsel, nor did it give them an opportunity to do so, the Agreement does not comply with Rule 1.8(a)(2).

{49}    Rule 1.8(a)(3) requires that the lawyer  obtain written informed consent by the client, in a writing signed by the client, which must include the essential terms of the contract and the nature of the lawyer's relationship with the contract.  Both parties acknowledge that there were no writings independent of the Agreement detailing the roles of the parties or the essential terms of the Agreement.  The separate written communications between Coch and his fellow IP members are insufficient to satisfy Rule 1.8(a)(3).

{50}    In sum, the Court determines that the Rules detail special requirements an attorney must follow when entering a business transaction with a client.  The client may elect to void a contract when the requirements have not been met, even if the failure to meet them does not give rise to the attorney's civil liability to the client.  There is no genuine issue of material fact that Plaintiff adhered to the requirements of Rule 1.8 when entering the Agreement as the Court construes Rule 1.8 must be applied.  Therefore, Defendants may elect to void the contract if it is otherwise valid and Defendants may defend against Plaintiff's claim based on its failure to comply with Rule 1.8.  Defendants are entitled to summary judgment on this basis whether or not they would separately be entitled to summary judgment on their assertion that the Agreement did not ever extend to proceeds for the sale of the patent.

## C. The Court's Alternative Conclusions of Plaintiff's Specific Claims[4]

{51}   While the Court's application of Rule 1.8 is dispositive, for completeness, the Court alternatively indicates its assessment of the competing contract interpretations.  It finds that should Plaintiff have been able to survive the defense grounded on the failure to satisfy Rule 1.8, Plaintiff's fraud claim would nevertheless fail as a matter of law, but that there are material issues of fact that would preclude summary judgment on the breach of contract claim.

### 1. Plaintiff's Fraud Claim

{52}   The Court first looks to have the fraud claim framed by the pleadings.  "In all averments of fraud, . . . the circumstances constituting fraud or mistake shall be stated with particularity." N.C. R. Civ. P. 9(b).  When pleading actual fraud, a plaintiff meets the particularity requirement "by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674,678 (1981).  The Court held in its January 25, 2014, Order that to prove fraud, the Plaintiff must produce "proof that Defendants had no intention to pay when first entering the Agreement." *Priest v. Coch*, Order on Defs.' Mot. to Dismiss, No. 12 CVS 3532 ¶ 38 [Durham] (N.C. Super. Ct. Jan 25, 2013), http://www.ncbusinesscourt.net/TCDDotNetPublic/default.aspx?CID=3&caseNumber=12CVS3532.

{53}   There is a marked contrast between the manner in which a fraud claim is alleged in the Complaint and how it is argued in Plaintiff's Response.  Plaintiff argues in its Complaint that "[o]n or about January 2010" the fraud was perpetrated by Defendants' having induced Plaintiff into entering into the Agreement.  (Compl. ¶¶ 106–14.)  Plaintiff further alleges that Defendants had

---

[4] A claim is limited by "admissions and allegations within their pleadings unless withdrawn, amended or otherwise altered." *Webster Enters., Inc. v. Selective Ins. Co. Se.*, 125 N.C. App. 36, 41, 479 S.E.2d 243, 247 (1997).  This doctrine precludes Plaintiff's efforts to assert claims for breach of oral contract and *quantum meruit*, which were first raised after the pleadings were closed and discovery completed.

knowledge at the time the parties entered into the Agreement that Defendants would have control over the funds, and that they would later deny that the Agreement existed. (Compl. ¶ 111.)

{54} In its Response, Plaintiff shifts temporal focus for the fraud claim to the time period around October 2011, when Defendants began discussions with Plut to sell the patent. Plaintiff claims in its Response that Coch perpetrated a continuous fraud that began in March 2010 and continued throughout the performance of the contract. Under this theory, Plaintiff alleges that, although Coch originally communicated an intention to split the profits from the patent with Priest, "a time arose when he changed his mind." (Opp'n Br. 21.)

{55} In North Carolina, fraud has no all-encompassing definition, but the following elements of fraud are well established: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568–69, 374 S.E.2d 385, 391 (1988) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)). There can be no recovery for fraud without an intent to deceive the other party. *See Watts v. Cumberland Cnty Hosp. Sys., Inc.*, 317 N.C. 110, 118, 343 S.E.2d 870, 885 (1986). For an actionable fraud claim to exist, the person making the allegedly fraudulent representation must have known that the representation was false when he made it. *Fulton v. Vickery*, 73 N.C. App. 382, 358, 326 S.E.2d 354, 358 (1985) (citing *Odom v. Little Rock & I-85 Corp.*, 299 N.C. 86, 261 S.E.2d 99 (1980)). "This determination of truth or falsity must be made at the time of the representation." *Id.* (citing *Childress v. Norman*, 238 N.C. 708, 713, 78 S.E.2d 757, 761 (1953)).

{56} Plaintiff has produced no evidence to indicate that Defendant, at the time he entered into the Agreement, did not intend to deliver twenty-five percent of the proceeds from the license or sale of the patent to Plaintiff. To the contrary, Plaintiff has tendered evidence that includes documents showing that Coch referred to Priest as a "partner" or a "shareholder," or otherwise indicated an intention to

include Priest in the success of the patent. (Opp'n Br. Exs. 10, 17, 20, 27.) The evidence does not support a conclusion that Coch disputed Priest's right to receive twenty-five percent of the proceeds until as late as March 20, 2012, when Priest and Coch first began to communicate regarding the disposition of proceeds from the sale of the patent to PPI. Because Plaintiff has produced no evidence to indicate that Coch knowingly made false statements at the time it entered into the Agreement with Priest, and acknowledging that the fraud claim that Plaintiff has pleaded is one of fraudulent inducement, there is no genuine issue of material fact on the fraud claim. While Plaintiff may assert that Defendants subsequently refused to abide by their agreement, that assertion represents a breach of contract claim. Defendants are entitled to summary judgment on the fraud claim.

2. Plaintiff's Breach of Contract Claim

{57} The contract claim revolves around whether the Agreement extends to both sales proceeds and license proceeds. Neither party disputes that the Agreement controls sharing of potential proceeds had the patent been licensed rather than sold, and that Plaintiff would have shared in licensing proceeds. Plaintiff claims that the Agreement clearly reaches all proceeds from monetizing the patent, whether by licensing or sale, as "GROSS REVENUES" are clearly defined to include both. (*See* Defs.' Ex. 13, § 2.1.) Defendants contend that the clear, express terms must be limited to a sharing of proceeds resulting from licenses negotiated by Plaintiff, and that the Agreement contains provisions for sharing licensing proceeds but includes no section regarding the sharing of sales proceeds. The Court finds that neither position can be adjudicated as a matter of law because of ambiguities in the Agreement's terms.

{58} "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *One Beacon Ins. Co. v. United Mech. Corp.*, 207 N.C. App. 483, 487, 700 S.E.2d 121, 124 (2010) (quoting *Ahmadi v. Triangle Rent A Car, Inc.*, 203 N.C. App. 360, 362, 691 S.E.2d 101, 103 (2010)). When interpreting a contract, the Court must determine the parties' intent

at the moment of the contract's execution using the language of the contract itself. *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973). The Court determines the intent of the contract by examining the entire instrument, rather than by examining only individual portions of the contract. *S. Seeding Serv., Inc. v. W.C. English, Inc.*, 217 N.C. App. 300, 305, 719 S.E.2d 211, 215 (2011). "When the terms of the contract 'are plain and unambiguous, there is no room for construction. The contract is to be interpreted as written . . . .'" *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632, 685 S.E.2d 85, 91 (2009) (quoting *Jones v. Casstevens*, 222 N.C. 411, 413, 23 S.E.2d 303, 305 (1942)). However, the Court must undertake a different analysis when the meanings of the terms are not easily discernable by themselves. The Court must construe the contract as a whole, and the unclear terms must be interpreted in context with the rest of the contract. *Dixie Container Corp. v. Dale*, 273 N.C. 624, 627, 160 S.E.2d 708, 711 (1968); *Sec. Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 93, 143 S.E.2d 270, 275 (1965). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." *Stovall v. Stovall*, 205 N.C. App. 405, 410, 698 S.E.2d 680, 684 (2010) (quoting *Lynn v. Lynn*, 202 N.C. App. 423, 431, 689 S.E.2d 198, 205 (2010)).

{59} Both parties point to the same provisions of the contract to support their argument that the contract either does or does not grant to Plaintiff twenty-five percent of the gross revenues from the sale of the patent. "GROSS REVENUES" is defined as "the total actual amount of all fees, royalties, and/or consideration of any kind, collected from licensing, optioning or selling the INVENTION." (Defs.' Ex. 13, § 2.1.) "NET REVENUES" is defined as "GROSS REVENUES minus PATENT EXPENSES and LICENSING EXPENSES." (Def. Ex. 13, § 2.6.) In the section entitled "LICENSING," the Agreement outlines the payments due to the parties:

a) GROSS REVENUES from licenses negotiated by PRIEST under this AGREEMENT will be distributed on an annual basis on or before December 31 of each year, in the following manner:

b) PATENT EXPENSES and LICENSE EXPENSES shall be reimbursed as outlined above, and then Twenty-Five Percent (25%) of NET REVENUES shall be distributed to each party.

(Defs.' Ex. 13, § 4.2(a)–(b).) There is no corresponding section for selling the patent or sharing revenues from a sale of the patent. No other provisions directly deal with Plaintiff's right to payment under the contract.

{60} The Court finds that the language of the Agreement and the intent of the parties is ambiguous. A jury's resolution of the contested claims under the Agreement would be necessary but for Defendants' valid defense pursuant to Rule 1.8 as discussed above. Further, but for the application of Rule 1.8, the Court is not presently prepared to foreclose as a matter of law that a separate oral agreement may have been reached.

{61} Accordingly, neither party would be entitled to summary judgment on the breach of contract claim if Defendants' defense grounded on Rule 1.8 was not valid.

## VI.   CONCLUSION

{62} For the reasons expressed above, Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and Plaintiff's Complaint is HEREBY DISMISSED.

IT IS SO ORDERED, this the 5th day of November, 2014.